Managers Discount Corporation v. Commissioner.
Managers Discount Corp. v. Commissioner
Docket No. 108824.
United States Tax Court
1943 Tax Ct. Memo LEXIS 429; 1 T.C.M. (CCH) 688; T.C.M. (RIA) 43108; February 27, 1943
*429 Harold H. Bredell, Esq., 115 N. Pennsylvania St., Indianapolis, Ind., for the petitioner. John D. Kiley, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent has determined deficiencies in income tax and excess profits tax against the petitioner for the year 1937 in the respective amounts of $5,379.99 and $2,145.17. The only issue raised by the pleadings is whether the respondent is in error in determining the value of certain stock received by the petitioner in exchange of securities. Findings of Fact Some of the facts have been stipulated and are found as stipulated. Those facts appearing hereafter which are not from the stipulation are facts found from the evidence presented at the hearing. The petitioner is an Indiana corporation, organized in 1927, and has its principal office and place of business in Indianapolis, Indiana. Its return for the year 1937 was filed with the Collector of Internal Revenue for the District of Indiana. R. D. Brown has been president of the petitioner since 1934 and controls all of its stock. The petitioner is a corporation through which the management of a number of properties belonging to other *430 corporations in which Brown is a dominating party is conducted. During 1935, 1936 and 1937 the petitioner purchased for $393,005.65 certain Convertible Six Percent Ten-year Secured Notes, Series A, of Indiana Southwestern Gas & Utilities Corporation, sometimes hereinafter referred to as the Debtor or Debtor Corporation, in an aggregate face amount of $1,885,500. The Convertible Notes so acquired by petitioner constituted a major part of a total issue of $2,500,000, which issue was secured under a collateral trust indenture dated June 1, 1930, by the following pledged securities: $1,000,000 Face Amount - Mortgage Gold Bonds, Series A, of Indiana Southwestern Gas Corporation 1,000 Shares - No Par Value Common Stock of Indiana Southwestern Gas Corporation $1,875,000 Principal Amount - Mortgage Gold Bonds, Series A, of Grayburg Oil Company 27,051.58 Shares - $100 Par Value Common Stock of Grayburg Oil Company $250,000 Face Amount - Mortgage Gold Bonds, Series A, of Newton Pipe Line Company, Inc. 1,000 Shares - No Par Value Stock of Newton Pipe Line Company, Inc. 3 Shares - No Par Value Common Stock of Gas Transport Company, Inc. 100 Shares - No Par Value Common Stock of Pike *431 Gas Corporation, Inc. $49,080.93 - Convertible Fifteen Year Gold Notes, dated May 1, 1930, of Pine Street Corporation 50 Shares - $10 Par Value Common Stock of Kilnoc Blue Refining Corporation The above-described securities together with $210,000 principal amount of Secured Six Percent Gold Bonds of Newton Pipe Line Company, Inc., sometimes hereinafter referred to as Newton, and the stock of Pine Street Corporation constituted the assets of the Debtor Corporation and gave it control over the various corporations named. These said corporations were divisible into two groups. One group, designated as the Indiana group, consisted of Indiana Southwestern Corporation, Newton Pipe Line Company, Inc., Pike Gas Company, Inc., Gas Transport Corporation, Inc., and Pine Street Corporation. These companies were engaged in the development, production or distribution of natural gas in the state of Indiana. The other companies, known as the Texas group, consisted of Grayburg Oil Company, sometimes hereinafter referred to as Grayburg, Grayburg Pipe Line Company, Kilnoc Blue Refining Corporation and Muen-Rio Oil Company and were engaged in the development, production or distribution of crude oil *432 in the state of Texas, Grayburg Oil Company owned the stock of Grayburg Pipe Line Company and the Class A stock, 505 shares, of Muen-Rio Oil Company. Four hundred and ninety-five shares of Class B stock and an $85,000 secured note of the latter corporation belonged to outside interests. On June 29, 1935, the Debtor Corporation filed a petition in the United States District Court for the District of Delaware for reorganization under section 77 B of the Bankruptcy Act. Under date of February 1, 1937, a plan of reorganization was filed with the court, which plan was approved by the court by order dated March 5, 1937. The plan and the results sought to be accomplished were stated generally as follows: THE PLAN It is proposed in the Plan to eliminate the Debtor and certain of its subsidiary companies, to cancel all of the bonds of subsidiaries, now held by the Debtor and to discharge the existing mortgages by which the same are secured (subject to the provisions of Article II with respect to the issue of new First Mortgage Bonds of Indiana Southwestern Gas Corporation to secure the performance by it of a contract for the sale of gas), and, after certain readjustments of the capital *433 structures of the subsidiaries whose existence is to be preserved, to distribute to the Noteholders the stock of two companies, of which one is to own directly or indirectly the assets now owned by the Indiana Companies and the other is to own directly or indirectly the assets now owned by the Texas Companies. The Notes are to be surrendered and cancelled upon such distribution, and the Collateral Trust Indenture under which they were issued is to be discharged. These readjustments will result in a greater simplification of the present corporate structure and will, it is believed, effect substantial economies through the reduction of overhead applicable to inter-corporate administration and other expenses arising from the existing complex system of companies. The elimination of the present funded indebtedness of the subsidiary companies will reduce the fixed charges to be borne by the two companies whose stock is to be distributed to the existing Noteholders. This stock will represent the ownership of the combined assets of the present group of companies; as the existing stocks and securities of those companies constitute the only security for the Notes, the Noteholders will, through *434 the reorganization, acquire a more direct interest in the properties which now indirectly secure their Notes. Article III of the plan of reorganization provided in part as follows: ARTICLE III. Simplification of Corporate Structure of Subsidiaries - New Securities Upon the confirmation of the Plan by the Court in the Reorganization Proceeding, it is proposed to simplify the corporate structure of the subsidiary companies owned and controlled by the Debtor to accomplish the results outlined below in this Article III. To this end the Debtor shall cause to be taken proceedings to eliminate the companies which are not to remain in existence by such consolidations, mergers, sales, transfers of assets, dissolutions and other steps as may be advisable. In addition, such proceedings by the Debtor will include all steps necessary to consummate the settlement of the Hoosier Gas controversy as hereinabove set forth, and the creation and issue to the Debtor of the New Securities hereinafter described, which will be exchanged for the securities now held by the Debtor and ultimately be distributed to the holders of the Notes of the Debtor as provided in Article IV. There will be released from *435 the Collateral Trust Indenture securing the Notes the securities of the Indiana and Texas Companies now pledged thereunder, to be surrendered, transferred or distributed by the Debtor in accordance with the provisions of the Plan. A. Indiana Companies. It is contemplated that after such proceedings have been completed, there will be only two companies owning and operating the properties located in the State of Indiana, of which one (hereinafter referred to as Indiana) will own and operate the properties to be subjected to the lien of the new First Mortgage $ entioned in Article II, and the other (hereinafter referred to as Newton) will own and operate the balance of the properties located in the State of Indiana, and will own and hold the entire capital stock of Indiana. The existing corporate entities of Indiana Southwestern Gas Corporation and Newton Pipe Line Company, Inc., may be retained for this purpose, or new corporations may be formed to which the assets will be transferred, or one or more of the charters of the presently existing corporations other than Indiana Southwestern Gas Corporation and Newton Pipe Line Company, Inc. may be utilized. Indiana and Newton will continue *436 to be obligated by, or will assume, all the obligations of Indiana Southwestern Gas Corporation and Newton Pipe Line Company, Inc., respectively, except the presently outstanding bonds of said companies and the indebtedness of said companies to the Debtor and its subsidiary companies. The presently outstanding bonds of Indiana Southwestern Gas Corporation and of Newton Pipe Line Company, Inc. will be surrendered by the Debtor, will be cancelled, and the mortgages securing the same discharged of record. The capital stock of Newton will consist of 5,000 shares of Common Stock without par value, described in subdivision C of this Article III, which will be issued and delivered to the Debtor for distribution by it in accordance with the provisions of Article IV. B. Texas Companies. Of the Texas Companies, Kilnoc Blue Refining Corporation (which has no assets) will be dissolved. The entire capital stock of Grayburg Pipe Line Company and the 505 shares of Class A Stock of Muen-Rio Oil Company will continue as heretofore to be owned by Grayburg Oil Company, and the 495 shares of Class B Stock and the $85,000 note of Muen-Rio Oil Company will remain outstanding. Grayburg Oil Company *437 will create an issue of 5,000 shares of Preferred Stock, described in subdivision C of this Article III, which will be issued and delivered to the Debtor in exchange for and upon cancellation of the $1,875,000 principal amount of Mortgage Bonds of Grayburg Oil Company now owned by the Debtor, and will be distributed by the Debtor in accordance with the provisions of Article IV. The par value of the Common Stock of Grayburg Oil Company will be changed from $100 per share to no par value, and the total number of shares authorized to be issued will be increased to 60,000 shares in order to make available a sufficient number of shares for issue in case of the exercise by the holders of the Preferred Stock of their conversion rights described in subdivision C of this Article III. The Common Stock now outstanding will remain in the hands of its present holders, except that 51.58 of the shares now owned by the Debtor will be surrendered and cancelled; the 27,000 shares of said Common Stock which will continue to be owned by the Debtor will be distributed by it in accordance with the provisions of Article IV. Upon the surrender for cancellation of said Bonds of Grayburg Oil Company, the Mortgage *438 securing the same will be discharged. C. New Securities. Upon the consummation of the foregoing proceedings, there will be held by the Debtor for distribution in accordance with the Plan: (1) 5,000 shares of the Common Stock of Newton. (2) 5,000 shares of the Preferred Stock of Grayburg Oil Company. (3) 27,000 shares of the Common Stock of Grayburg Oil Company. * * * * *
D. Cancellation of Inter-Company Indebtedness All Indebtedness between and among the Debtor and its subsidiary and affiliated companies shall be cancelled. It was thereafter provided in Article IV of the plan that the 5,000 shares of the common stock of Newton Pipe Line Company, Inc., the 5,000 shares of preferred stock of Grayburg Oil Company and the 27,000 shares of common stock of that corporation should be distributed by the Debtor Corporation to the holders of its Convertible Six Per Cent Ten-year Secured Notes. For each $1,000 aggregate principal amount of Notes, the holder thereof was to receive 2 shares of the common stock of Newton and 2 shares of preferred and 10.8 shares of the common stock of Grayburg Oil Company. The holders of secured claims, preferred claims and unsecured claims other than *439 the holders of Convertible Notes were to be paid in cash. The various steps in the plan preliminary to the distribution of the Grayburg and Newton shares to the Noteholders having been taken, the court on May 5, 1937, entered its order directing distribution of the said Newton and Grayburg stocks and payment of the claims. No assets were available for distribution to the stockholders of the Debtor Corporation. On or about December 28, 1937, the petitioner surrendered the Notes of the Debtor Corporation held by it in exchange for 3,771 shares of the common stock of the Newton Pipe Line Company, Inc., 3,771 shares of preferred stock and 20,363.4 shares of common stock of Grayburg Oil Company. The stock of Grayburg and Newton so received was entered by petitioner on its books at a cost of $393,005.65, which amount was the cost of the Convertible Notes of the Debtor Corporation exchanged therefor. This cost was allocated, $45,279 to the 3,771 shares of Newton common stock, $301,545 to the 3,771 shares of Grayburg preferred stock and $46,181.65 to the 20,363.4 shares of Grayburg common stock. The amount, approximately $12 per share, at which the Newton common stock was set up on the *440 books of the petitioner was based on the estimated salvage value of the Newton properties and the amount at which the Grayburg preferred stock was set up was based on a per share value of $80, which was the value at which the stock was accepted for collateral purposes; while the amount at which the Grayburg common stock was set up, approximately $2,26 per share, represented the balance of the cost of the Convertible Notes of the Debtor Corporation which had been given in exchange. Prior to the bankruptcy proceedings the capital structure of Grayburg Oil Company consisted of $1,875,000 principal amount of Mortgage Gold Bonds and 30,000 shares of common stock, having a par value of $100 per share. The Mortgage Gold Bonds and 27,051.58 shares of the common stock were owned by the Debtor Corporation, 2,767.81 shares of the stock were held by the public, and 180.61 shares were held by Grayburg in its treasury. After the bankruptcy proceedings the $1,875,000 of Mortgage Gold Bonds had been eliminated by cancellation, the 30,000 shares of $100 par value common stock had been surrendered, and 5,000 shares of $100 par value preferred stock and 30,000 shares of no par value common stock had *441 been issued. Of the 30,000 shares of new common stock, the petitioner acquired 20,363.4 shares upon surrender of the Convertible Secured Notes to the Debtor Corporation and the remainder, except possibly for a few shares held by Grayburg in its treasury, were acquired by the general public. On June 30, 1936, approximately one year prior to the consummation of the above-described plan, a special master appointed by the court had made a report showing that the liabilities of Grayburg amounted to $1,948,326.48 and that its total assets had a value of $412,693.01. The above liabilities included the $1,875,000 of Mortgage Gold Bonds cancelled in the 77 B reorganization. The preferred stock of Grayburg Oil Company issued pursuant to the above-described plan was $5 cumulative preferred stock and had a preference in liquidation over the common stock to the extent of $100 per share. The highest price at which any of such stock has been sold since its issuance in 1937 has been $50 per share. Grayburg has regularly paid the $5 dividend on the preferred stock since it was issued, but during that period has paid no dividend on the common stock. For the period 1935 to 1941 the consolidated annual *442 net earnings or losses of Grayburg Oil Company and Grayburg Pipe Line Company, as shown by their books, were as follows: 1935
Loss
$165,205.37
1936
Loss
113,240.89
1937
Profit
2,991.41
1938
Loss
42.78
1939
Loss
38,599.86
1940
Loss
9,050.86
1941
Profit
18,328.66
From 1935 through 1937 Grayburg Oil Company owned a number of producing oil leases in the state of Texas. R. D. Brown took charge of the properties of Grayburg Oil Company on February 1, 1935, and became its president in 1936. During the years 1935 to 1938, inclusive, Brown made numerous trips to Texas to inspect the properties of Grayburg Oil Company and was familiar with them. The common stock of Grayburg Oil Company has never been listed on any stock exchange, and there has never been any market listing or record of any bid or asked quotation on said stock. Sometime in September 1937 Brown gave orders to three brokers to purchase either on his own behalf or on the behalf of the petitioner, at a ceiling price of $4 per share, all shares of the common stock of Grayburg Oil Company that were offered for sale. He also instructed the brokers that he wanted to be told about any shares of the common stock *443 of Grayburg Oil Company that came to their attention which could not be purchased for $4 a share. All of the shares of Grayburg common stock shown to have been sold, with the possible exception of 15 shares, were sold to the petitioner or to Brown for the account of the petitioner. The petitioner never directly solicited the purchase of any stock, never purchased stock except through the brokers, and purchased only such shares as came into the market. The purchases of Grayburg common stock by the petitioner or Brown for the account of the petitioner, during 1937, 1938 and 1939, totaled 1,432 shares, averaged 42 shares per transaction, and ranged in price from $1 to $5 per share, the average price per share being approximately $3.40. The sales of Grayburg common stock nearest December 28, 1937, the basic date in this proceeding, and for the six-month period September 25, 1937, to March 17, 1938, were as follows: Average
Number
Price
of
per
Date
Shares
Cost
Share
Sept. 25, 1937
26.6
$ 86.40
$3.24
Oct. 2, 1937
64.8
324.00
5.00
Oct. 2, 1937
21.6
108.00
5.00
Oct. 12, 1937
108
432.00
4.00
Oct. 18, 1937
29.6
118.40
4.00
Oct. 18, 1937
.8
3.20
4.00
Oct. 23, 1937
108
432.00
4.00
Oct. 27, 1937
.8
3.20
4.00
Jan. 7, 1938
64.8
81.00
1.25
Feb. 23, 1938
11
22.00
2.00
Mar. 10, 1938
1
4.00
4.00
Mar. 14, 1938
32.4
129.00
4.00
Mar. 17, 1938
120
600.00
5.00
*444 In making his determination of deficiency the respondent has accepted the amounts of $45,279 and $301,545, at which the Newton Pipe Line Company common and the Grayburg preferred stocks were entered on the petitioner's books, as representing the fair market value of those stocks on December 28, 1937, when they were acquired, but has determined that the 20,363.4 shares of Grayburg common stock had a fair market value on that date of $81,453.60, or an average of $4 per share, instead of $46,181.65, or $2.26 per share, at which the said shares were entered on the petitioner's books. The fair market value of the Grayburg common stock on December 28, 1937, was $4 per share. Opinion The pleadings present for determination a single question of fact, namely, the fair market value of 20,363.4 shares of the common stock of Grayburg Oil Company on December 28, 1937, the date on which the said shares were received as a part of the consideration in exchange for the Convertible Secured Notes of Indiana Southwestern Gas & Utilities Corporation. The respondent has determined that the said shares had a fair market value on the basic date of $81,453.60, or $4 per share. The petitioner claims that *445 the value of the shares was not in excess of $2.26 per share, at which rate they were entered on its books. Grayburg was engaged in the production of crude oil and related activities either directly or through its subsidiary or subsidiaries. Its financial structure had just been revamped in proceedings for the reorganization, under section 77 B of the Bankruptcy Act, of Indiana Southwestern Gas & Utilities Corporation, which prior thereto had owned 27,051.58 of the 30,000 Grayburg common shares outstanding and its Mortgage Gold Bonds amounting to $1,875,000. The bonds of Grayburg had been canceled, its stock had been reclassified, and the properties of one of its subsidiaries apparently acquired in place of stock previously held therein, the purpose being to simplify the corporate structure and effect substantial economies through the reduction of overhead and other expenses arising from the existing complex system of companies. After the bankruptcy proceedings the petitioner held approximately two-thirds of the outstanding shares of Grayburg common stock, while the remaining common shares were held by the general public. At or about the time of the final order of the court in the *446 bankruptcy proceedings, Brown, president of both the petitioner and Grayburg, placed standing orders with three brokers to purchase, at a ceiling price of $4 per share, all of the Grayburg common stock which should come on the market. He also instructed the brokers to advise him of any such shares coming to their attention which could not be purchased for $4 per share. In giving these orders, Brown was acting for the petitioner. The stock was not listed on any exchange, and there was no active market. Except possibly for three sales covering 15 shares, all of the known sales from the date of the purchase orders through 1939 were sales to the petitioner. During the period from September 25, 1937, to March 17, 1938, which included periods immediately preceding and immediately following December 28, 1937, the basic date herein, the petitioner acquired 589.4 shares at an average cost of $4 per share. Up to December 31, 1939, 1,432 shares had been acquired in transactions averaging 42 shares, at prices ranging from $1 to $5, the average price per share being approximately $3.40. The respondent has determined that $4 per share was the fair market value of the said stock on December 28, *447 1937. The petitioner claims that the value so determined by the respondent is not justified by Grayburg's earnings record, the value of its assets or by the sales of the stock. For proof of the value of the Grayburg assets, it stresses the findings and recommendations contained in the report of the special master filed on June 30, 1936, long prior to the revamping of Grayburg's financial structure pursuant to the reorganization under the bankruptcy proceedings. With respect to earnings, the petitioner seeks to take into consideration not the earnings of Grayburg alone but the consolidated earnings or losses of Grayburg and Grayburg Pipe Line. Furthermore, it seeks to take into account consolidated losses sustained prior to the said reorganization, when Grayburg was still liable for interest at 6 percent on its $1,875,000 of outstanding bonds and before the simplification of the corporate structure and the effecting of "substantial economies through the reduction of overhead applicable to intercorporate administration and other expenses arising from the existing system of companies," contemplated by the plan adopted in the 77 B proceedings. It also contends that no weight should be *448 given to representations made by its president, Brown, in a letter written on November 16, 1937, to the effect that the figure of $4.24 per share at which the shares of Grayburg common stock had been purchased up to that date by the three brokers did not "reflect the potential profit" which he hoped and felt sure would "come out of the ownership of the control of the * * * Texas properties." Considering the evidence in the case, including the price at which the Grayburg common stock was being purchased on the market, the anticipated economies from the cancellation of the heavy bonded indebtedness and other economies resulting from the simplification of the corporate structure, the potential profits anticipated by those who were in a position to know its business prospects, and other evidence of record bearing upon the fair market value of the Grayburg common stock at the basic date, we conclude that the petitioner has not shown that the repondent's determination of $4 per share for the Grayburg common stock at the time it was acquired was in error, but, to the contrary, that the evidence supports that determination. On brief, the petitioner's counsel contends for the first time *449 that "The transaction whereby Petitioner exchanged certain Convertible Notes for shares of stock did not constitute a taxable exchange or sale, because said transactions came within the non-recognition provisions of the Revenue Act of 1936, to-wit: Section 112 (b) (3), 112 (b) (5), 112 (g) and the related statutory provisions and regulations thereunder." To support this proposition, he relies upon ; ; ; and . He contends that the petitioner has at all times regarded the exchange as being within the scope of the statutory provisions mentioned and that its assignment of error so indicates. He argues further that the "law on the subject of reorganizations and the question of taxable character of an exchange such as existing in the case at bar has been changed by the decision of the United States Supreme Court in Helvering v. Cement Investors, *450 Inc." and under the pronouncements of the Supreme Court in , the question as to the character of the transaction should now be considered by this tribunal before reaching its decision herein. The allegation of error as it appears in the petition reads as follows: The Commissioner was in error in assessing tax for additional income alleged to have been realized in the sum of $35,271.95 in the calendar year 1937 as a taxable gain resulting from the exchange by the petitioner of notes of Indiana Southwestern Gas & Utilities Corporation for certain shares of stock of Newton Pipe Line Company, Inc., Grayburg Oil Company common stock, and Grayburg Oil Company preferred stock, which exchange was effected under the orders of the District Court of the United States for the District of Delaware in the reorganization of Indiana Southwestern Gas & Utilities Corporation. The specific issue in dispute is the Commissioner's determination of the value of shares of common stock of Grayburg Oil Company at a value of $4.00 per share, or a total value of $81,453.60 for the 20,363.4 shares exchanged, contrary to the value of $2.26 per *451 share, or a total value of $46,181.65 shown by the books of the petitioner. The Commissioner's determination of the value of the other shares involved, namely, the Grayburg Oil Company preferred stock and Newton Pipe Line Company, Inc., common stock, is in accordance with the value shown by the taxpayer's books and is therefore not in controversy. At the hearing, counsel for both the petitioner and the respondent agreed that the only remaining assignment of error was the respondent's determination of the fair market value of the Grayburg common stock on the date acquired by the petitioner, and later in the proceeding, when objection had been made to the admission of evidence covering the details of the transactions occurring in the 77 B proceedings, counsel for the petitioner disavowed any intention to question the nature or character of the transaction, but urged that the matter then offered should be received in evidence as bearing on the value of the Grayburg stock as of the date acquired by the petitioner. It was on that basis that the evidence offered was received. It is not for us to try to guess the facts that might or would have been disclosed by the evidence if the issue *452 which the petitioner now seeks to argue had been properly raised by the plcadings and hearing had thereon. Prerequisite, however, to the applicability of section 112 (b) (3), supra, there must have been a reorganization within the meaning of section 112 (g) (1), supra, and in that connection we do know, for instance, that Grayburg did not acquire all or substantially all of the properties of Indiana Southwestern Gas & Utilities Corporation. On the other hand, various facts are not known. The petitioner's own discussion leaves us in the dark as to certain details of Grayburg's participation in the 77 B reorganization and their pertinence to the issue petitioner now seeks to have decided, in that it states as one fact that the transaction made no change in the Grayburg assets and as another that after transaction Grayburg held the Muen-Rio Oil Company's assets "in lieu of stock ownership," while in that connection the record shows that prior to the transaction Grayburg's interest in Muen-Rio Oil Company was limited to 505 of the 1,000 shares of Muen-Rio stock outstanding and that the remaining shares and an $85,000 secured note belonged to outside interests. Similarly, for *453 the purpose of showing the applicability of section 112 (b), supra, we should have to assume facts not shown by the record or deny applicability of section 112 (b) (5) for failure of proof. That section is applicable where property is transferred to a corporation by one or more persons solely in exchange for stock and securities in such corporation and immediately after the exchange such person or persons are in control of the corporation. Specific provision is made, however, that the section shall apply "only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange." The facts show that prior to the 77 B reorganization Grayburg had outstanding $1,875,000 par value Mortgage Gold Bonds and 30,000 shares of common stock, that Indiana Southwestern Gas & Utilities Corporation was the owner of the bonds and 27,051.58 shares of the common stock, and that 2,767.81 of the remaining shares were held by the public generally. In the reorganization Indiana Southwestern Gas & Utilities Corporation received for the Mortgage Gold Bonds and old common stock the 5,000 shares of new preferred stock of Grayburg *454 and 27,000 of the 30,000 shares of new Grayburg common stock, and the general public for its old Grayburg common received shares of the new Grayburg common stock. Assuming that section 112 (b) (5) would otherwise be applicable, the record falls far short of showing that the holdings of the Grayburg stock after the transaction were substantially in proportion to the interests of the said stockholders prior thereto. In , where the taxpayer undertook to go outside of the pleadings and after hearing had been concluded to argue the statute of limitations, we said, "Orderly procedure requires that the issues be clearly framed in the pleadings that both parties may have notice and an opportunity to produce their evidence. An orderly procedure is necessary if the Board is to handle the large number of cases filed with it and if proper records are to be made for review in the courts. To attempt to decide any issue with respect to the statute of limitations upon the basis of an ex parte statement in the brief that a certain waiver in terms therein quoted was filed would be to deny the respondent a hearing *455 upon this issue and an opportunity to produce his evidence." , relied upon by the petitioner, was decided after the hearing in this proceeding but before briefs were filed, while , and companion cases were decided nearly four months prior to the hearing herein. The cases last mentioned gave ample notice of the status of bondholders for the purpose of applying section 112 (b), supra, to exchanges occurring under section 77 B proceedings. The petitioner had ample time to ask leave to amend its pleadings to raise the issue as to the recognition of gain realized upon the acquisition of the Grayburg stock, and no motion, timely or otherwise, to amend the pleadings to raise such an issue has been received. Even if we should now entertain and grant a motion to amend the pleadings to raise the issue argued, it is obvious from the above that a second trial would be indicated and necessary to give the respondent his day in court or to prevent entry of decision for failure of proof. If this Court should be required or should attempt *456 to hold cases open for a second trial on alternative issues not properly or timely raised, it should never be able to dispose of the cases before it. The petitioner has had its trial on the issue raised by its pleadings, and on that issue the case is decided. Decision will be entered under Rule 50.